UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 20-05379 |
| Spero A. Poulos | ) | |
| | ) | Chapter 7 |
| Debtor. | ) | |
| | ) | |
| Republic Bank of Chicago | ) | |
| | ) | |
| Plaintiff, | ) | Adv. No. 20-00388 |
| v. | ) | |
| Spero A. Poulos, | ) | Honorable Deborah L. Thorne |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND PARTIALLY GRANTING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**

This matter comes before the court on two motions for summary judgment. Republic Bank of Chicago ("**Plaintiff**") moves for summary judgment on its amended complaint, which alleges that $149,000 of its claim against Spero A. Poulos ("**Defendant**") is nondischargeable under § 523(a)(2)(A) of the Bankruptcy Code.[1] Defendant's cross-motion for summary judgment argues that all his personal liability to Plaintiff is dischargeable and that the undisputed facts make it impossible for Plaintiff to prove otherwise. On the record before it, the court finds that most of Plaintiff's claim is dischargeable, but certain disputed, material facts affect the dischargeability of $26,000 of Plaintiff's claim. Therefore, for the reasons described below, the court denies Plaintiff's motion, grants Defendant's cross-motion with respect to $123,000 and denies Defendant's cross-motion with respect to $26,000.

---

[1] Unless otherwise indicated, all statutory provisions cited in the text refer to Title 11 of the U.S. Code.

**FACTUAL BACKGROUND**

Defendant's construction company, Poulos, Inc., borrowed $999,000 from Plaintiff under a line of credit (the "**LOC**") established by a promissory note and a business loan agreement.[2] Defendant personally guaranteed all of Poulos, Inc.'s liabilities to Plaintiff.[3]  Under the terms of the business loan agreement, Plaintiff extended the LOC in reliance on Poulos, Inc.'s affirmative covenant (the "**Covenant**") to, among other things, "[u]se all Loan proceeds solely for [Poulos, Inc.]'s business operations."  In addition, Poulos, Inc. agreed that it would not "[l]oan, invest in or advance money or assets to any other person, enterprise or entity."  The promissory note, the business loan agreement and the guaranty (together, the "**Loan Documentation**") are each governed by Illinois law, and none contains any segregation provision that would require Poulos, Inc. to keep the loan proceeds in a separate account.

Poulos, Inc. kept a commercial checking account at Plaintiff's bank (the "**RB account**") funded by two types of commingled deposits: loan proceeds drawn from the LOC and business proceeds earned from Poulos, Inc.'s operations.  The last draw on the LOC amounted to $220,000 and was deposited into the RB account on March 15, 2018.[4]  After that, $7.2 million of gross business proceeds were gradually deposited into, and subsequently transferred out of, the RB account intermittently over the course of the ensuing year.  From March 16 to August 1, 2018, $4 million was deposited and $3.7 million was withdrawn from the RB account.

---

[2] Unless otherwise indicated, all statements in this section are taken from the parties' responses to each other's statement of uncontested facts.  *See* Dkt. No. 62 (Defendant's response to Plaintiff's statement of uncontested facts); Dkt. No. 74 (Plaintiff's response to Defendant's statement of uncontested facts).

[3] On April 21, 2020, Plaintiff obtained a judgment against Poulos, Inc. in the amount of $931,605.82.  Judgment against Defendant for that amount under the personal guaranty was stayed by Defendant's voluntary petition under chapter 7 of the Bankruptcy Code.

[4] The parties have not provided any information about earlier draws on the LOC, other than their total amount: $779,000.

Between August 23, 2018 and March 1, 2019, eleven checks transferred a total of $170,000 out of the RB account to other accounts controlled by Defendant (the "**$170,000 transfers**").  The parties agree that six checks transferred $90,000 to Poulos Construction Company Equipment, Inc. ("**Poulos Equipment**") and five checks transferred $80,000 to Poulos, Inc.'s account at Bank of America (the "**BoA account**").  The parties disagree about the sources and uses of those funds. Plaintiff alleges that $149,000 of those funds were loan proceeds that were subsequently used for non-business purposes, thus violating the Covenant and rendering the $149,000 in question nondischargeable under § 523(a)(2)(A).[5]  Defendant alleges that the entire $170,000 was business proceeds, so the Loan Documentation does not restrict his use of that money, and all his personal liability to Plaintiff is dischargeable.

The RB account statements in the record indicate the balance of the RB account on each day one of those eleven checks was cashed.  *See* Dkt. No. 68, Exhibits 6-7.  Most of the checks (amounting to $120,000) were cashed on days when the RB account had so much money in it that even if there had been no final $220,000 draw on the LOC, the check could have been funded with business proceeds earned from Poulos, Inc.'s operations.  Four of the eleven checks, however, amounting to $50,000 (the "**$50,000 transfers**"), were cashed on days when the balance in the RB account was (or may have been) so low that those checks would have bounced if not for the final $220,000 draw on the LOC.[6]  That is, without the loan proceeds in the RB account, Defendant

---

[5] Actually, $41,500 of the $149,000 in question was transferred from Poulos Equipment to Defendant's personal account prior to the final draw on the LOC on March 15, 2018.  *See* Dkt. No. 74 at 3-4.  Neither party has provided any evidence regarding the original source of that $41,500 or how it got into Poulos Equipment's account.  Therefore, the court disregards that $41,500 and focuses instead on the eleven checks that transferred $170,000 out of the RB account where the loan proceeds were deposited.

[6] The four checks effectuating the $50,000 transfers—and, if known, the dates (in 2018) they were withdrawn from the RB account and the balance in the RB account on those dates—are as follows: (1) check number 120325 (for $10,000, dated November 21) was withdrawn on November 23 when the balance in the RB account was $219,739.91; (2) check number 13001 (for $15,000, dated December 28) was withdrawn on December 31 when the balance in the RB account was $185,443.80; (3) check number 121527 (for $15,000, dated December 28) was withdrawn on December 31 when the balance in the RB account was $185,443.80; and (4) check number 120351 (for $10,000, dated

3

may not have been able to make the $50,000 transfers into the other accounts he controlled.  To borrow a forensic accounting phrase, the "lowest intermediate balance" of the RB account was below $220,000 on the days the $50,000 transfers were made.  *See In re Mississippi Valley Livestock, Inc.*, 745 F.3d 299, 309 (7th Cir. 2014).

Of those four checks effectuating the $50,000 transfers, three (amounting to $35,000) went to Poulos Equipment and one (amounting to $15,000) went to the BoA account.  Then $22,000 from Poulos Equipment and $4,000 from the BoA account were subsequently transferred to Defendant's personal bank account (the "**$26,000 transfers**").[7]  Whether the $26,000 transfers to Defendant's personal bank account were loan proceeds—and, if so, whether the $26,000 transfers were used in ways that violated the Covenant—remains in dispute.[8]

On or about July 1, 2019, Poulos, Inc. ceased all significant business operations.  Defendant filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code on February 27, 2020. Plaintiff commenced this adversary proceeding on October 30, 2020 and was granted leave to move for summary judgment a year later.  Having responded to Plaintiff's motion, Defendant subsequently moved for and was ultimately granted leave to file its cross-motion for summary judgment.  Discovery concluded before the motion and cross-motion for summary judgment were filed.

---

December 5) is attested by both parties but not reflected in the RB account statements filed with the court.  Note that when checks 120325, 13001 and 121527 were withdrawn from the RB account (on November 23 and December 31, 2018) the balance in the RB account was less than $220,000.  *See* Dkt. No. 68, Exhibits 6E and 6F.

[7] The checks that transferred $22,000 from Poulos Equipment to Defendant are as follows: (1) check number 1049 (for $3,500, dated November 27, 2018); (2) check number 1050 (for $3,500, dated December 11, 2018); (3) check number 1051 (for $3,000, dated December 28, 2018); (4) check number 1052 (for $4,500, dated December 28, 2018); (5) check number 1053 (for $3,000, dated January 4, 2019); and (6) check number 1054 (for $4,500, dated November 11, 2019).  The checks that transferred $4,000 from the BoA account to Defendant are as follows: check number 1520 (for $2,000, dated July 9, 2019) and check number 1528 (for $2,000, dated July 9, 2019).

[8] Additionally, on March 28, 2019, $60,000 was transferred from the BoA account to Eirene Builders, Inc. (a sub-contractor engaged by Poulos, Inc.), and the parties dispute whether that transfer was subject to and in compliance with the Covenant.  Resolution of that dispute is not necessary to determine the dischargeability of the $149,000 in question.

## JURISDICTION

The court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. This is a core proceeding under 28 U.S.C. § 157(b)(2)(I). Venue is proper under 28 U.S.C. § 1409(a).

## DISCUSSION

### I.      Analysis of Law

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Fed. R. Bankr. P. 7056. In ruling on a motion for summary judgment, uncontradicted evidence of the nonmovant must be accepted and all reasonable inferences drawn in the nonmovant's favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

Under § 523(a)(2)(A), "any debt for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud" is nondischargeable. 11 U.S.C. § 523(a)(2)(A). To establish nondischargeability under § 523(a)(2)(A), a creditor bears the burden of demonstrating by a preponderance of the evidence that (1) the debtor made a false representation or omission, (2) that the debtor (a) knew was false or made with reckless disregard for the truth and (b) was made with the intent to deceive, (3) upon which the creditor justifiably relied. *See Ojeda v. Goldberg*, 599 F.3d 712, 716-17 (7th Cir. 2010) (citing *Matter of Scarlata*, 979 F.2d 521, 525 (7th Cir. 1992)); *Grogan v. Garner*, 498 U.S. 279, 286 (1991). Discharge exceptions under § 523(a) are construed narrowly to further a key objective of the Bankruptcy Code: to grant honest debtors a fresh start. *See Bullock v. BankChampaign, N.A.*, 569 U.S. 267, 275-76 (2013) ("[E]xceptions to discharge should be confined to those plainly expressed … where strong, special policy considerations, such as the presence of fault, argue for

5

preserving the debt, thereby benefiting, for example, a typically more honest creditor.") (internal citations omitted).

When a creditor lends money to be used "for a specific purpose and the debtor has no intention of using it in that manner, a misrepresentation exists upon which a debt can be held non-dischargeable." *Matter of Sheridan*, 57 F.3d 627, 635 (citing *In re Pappas,* 661 F.2d 82, 86 (7th Cir. 1981)). Moreover, proof that the debtor never put the money toward the stated purpose allows a court to infer the requisite intent. *Id.*

When funds from different sources are commingled into one account, however, it is important to remember that "money is interchangeable." *Id.* "[I]t matters little that the exact money transferred by [the creditor] was not immediately used for the stated purposes" where funds were later used in the required manner. *Sullivan v. Glenn (In re Glenn)*, 502 B.R. 516, 540-41 (Bankr. N.D. Ill. 2013). The Seventh Circuit has emphasized that "absent a segregation provision, the important question is whether the debtor made use of equivalent amounts of money in the required manner." *Sheridan*, 57 F.3d at 636. If so, it is inappropriate to infer that any misrepresentation (should one exist) was made with the intent to deceive. *Id.* Other courts have held that if the debtor misapplies only a portion of a loan, the amount of the loan not used in the required manner is nondischargeable. *See, e.g.*, *In re Segala*, 133 B.R. 261 (Bankr. D. Mass. 1991).

To determine whether equivalent amounts of money have been used in the required manner, the court must rely on a tracing method that specifies the conditions under which restricted-use funds are presumed to leave a commingled account that also contains non-restricted funds. Common tracing methods include: (i) the "lowest intermediate balance" method ("**LIB**") (restricted funds are presumed to remain in the account unless the balance of the account falls

below the amount of the restricted funds); (ii) the "last-in, first-out" method ("**LIFO**") (restricted funds are presumed to be the first to leave the account after they are deposited into it); (iii) the "first-in, first-out" method ("**FIFO**") (restricted funds are presumed to leave the account in the order they are deposited into it); and (iv) the "pro rata" method (restricted funds are presumed to comprise a fraction of every transfer out of the account equal to the ratio of restricted to total funds in the account).  *See In re Lichtenberger,* 337 B.R. 322, 324 (Bankr.C.D.Ill. 2006).  There is no general rule or immutable formula that governs the choice of tracing method.  Rather, "[m]ethods of tracing commingled funds are 'an equitable substitute for the impossibility of specific identification' and therefore a court must 'exercise case-specific judgment to select the method best suited to achieve a fair and equitable result on the facts before them.'"  *In re Lantz*, 451 B.R. 843, 847-48 (Bankr. N.D. Ill. 2004) (quoting *United States v. Henshaw,* 388 F.3d 738, 741 (10th Cir. 2004)).

Policy concerns bear on this choice.  For example, when tracing funds is necessary to establish the extent of a debtor's exemption, courts have acknowledged that "exemption statutes are to be construed liberally to protect debtors" and have selected the tracing method most suited to that end.  *Lichtenberger,* 337 B.R. at 324 (relying on FIFO to construe a social security exemption in the debtor's favor). *See, e.g., Lantz*, 451 B.R. at 848 ("[H]ere, it is the application of the lowest intermediate balance rule that would benefit the Debtors, not the first-in first-out method."); *In re Wiltsie*, 463 B.R. 223, 228 (Bankr. N.D.N.Y. 2011) ("Guided by the liberal construction to be accorded exemption statutes in favor of debtors, the court uses the FIFO approach to trace the exempt funds in this case."); *In re Maine*, 461 B.R. 723, 732 (Bankr. S.D. Ohio 2011) (relying on LIB after considering "the policy underlying the exemption and the general rule that exemptions should be construed in favor of the debtor").  When tracing funds is necessary

to establish the extent of a voidable preference or fraudulent transfer, courts generally use LIB. *See Mississippi Valley*, 745 F.3d at 308-09; *In re Godwin*, 2015 WL 4505780, at *5 (Bankr. C.D. Ill. July 23, 2015). In the context of nondischargeability actions, the choice of tracing method may be informed by "the principle that the nondischargeability provisions are strictly construed against an objecting creditor and in favor of the debtor." *In re Miller*, 310 B.R. 185, 199 (Bankr. C.D. Cal. 2004) (rejecting FIFO because it favored the objecting creditor). *See also In re Wood*, 2007 WL 2154239, at *6 (Bankr. N.D. Tex. July 25, 2007) (relying on LIB to trace loan proceeds in a nondischargeaebility action).

## II. Application of Law

Applying the law to the facts before it, the court draws the following conclusions: (A) Plaintiff has not demonstrated the existence of a false representation or an intent to deceive; and (B) under the LIB tracing method, Defendant is entitled to summary judgment except with respect to $26,000.

### A. *Plaintiff has not demonstrated the existence of a false representation or an intent to deceive*

To prevail at the summary judgment stage, Plaintiff must demonstrate that the undisputed facts prove (by a preponderance of evidence) each of the elements of its § 523(a)(2)(A) action. *See Ojeda*, 599 F.3d at 716; *Grogan*, 498 U.S. at 286. Drawing all reasonable inferences in Defendant's favor, the court finds that Plaintiff has not met its burden of proof with respect to the first element (that is, false representation). Specifically, Plaintiff has not shown that Defendant's use of the LOC proceeds violated the Covenant or any other terms or conditions of the loan documentation.

Absent a segregation provision in the lending agreement, the important question is whether the debtor made use of equivalent amounts of money in the required manner. *Sheridan*, 57 F.3d

8

at 636.  In *Sheridan*, the creditor loaned funds to the debtor in reliance upon his promise that he would use the funds as an earnest money deposit.  *Id.* at 630.  The debtor first made the earnest money deposit with other funds, overdrawing his bank account to do so, and then used the loaned funds to replenish the overdrawn bank account.  *Id.*  Although the debtor did not make the earnest money deposit with the exact proceeds extended by the creditor, the court emphasized that money is fungible.  *Id.* at 636.  The court concluded that it did not matter that the debtor had a negative account balance at the time the loan proceeds were deposited into his overdrawn account; rather, the dispositive fact was that the debtor had used an equivalent amount to make the required earnest money deposit.  *Id*.

The situation in the case before the court is similar to *Sheridan*.  The record here indicates that after the last draw on the LOC, Poulos, Inc. continued its business operations for more than a year.  During that time, Poulos, Inc. was making payments from the RB account, where loan proceeds and business proceeds commingled.  After the final $220,000 draw on the LOC was deposited into the RB account on March 15, 2018, Poulos, Inc. made over $3.7 million of payments from that account before the problematic checks began to be withdrawn from it on August 23, 2018.  Consequently, even if Poulos, Inc. did not use the exact LOC proceeds for business operations, the undisputed facts make it entirely possible that $220,000 of that $3.7 million was used for Poulos, Inc.'s business operations as required by the Covenant.

Plaintiff cites *In re Tracy* to support its position.  *In re Tracy*, 203 WL 22148998 (C.D. Ill. 2003).  However, *Tracy* is distinguishable from the instant case.  In *Tracy*, the lender lent funds to the debtor that were to be used to pay a specific vendor, but after the debtor delivered the funds to the vendor, the vendor issued a check back for $3,000.  *Id.* at *2.  After receiving the $3,000 back, the debtor did not use it to pay the vendor, and the lender filed a lawsuit asking the court to

9

determine the $3,000 debt nondischargeable. *Id.* at *5. The court held that the debtor's receipt of the $3,000 from the vendor gave rise to a nondischargeable debt under § 523(a)(2)(A). *Id.* In *Tracy*, neither the exact loan proceeds nor any equivalent amount was used to pay the vendor $3,000. *Id.* That fact distinguishes *Tracy* from the instant case, where the undisputed facts are entirely consistent with Defendant's assertion that the loan proceeds were used as required.

Plaintiff also cites *In re McKnew* to support its position. *In re McKnew*, 270 B.R. 593 (E.D. Va. 2001). Unfortunately, *McKnew* is not instructive. In *McKnew*, the debtor was lent funds to be used as factoring capital. *Id.* at 603. The debtor did not use the funds for factoring capital but instead used them for other purposes not authorized by the lender. *Id.* at 616. The lender argued that the debt was nondischargeable under § 523(a)(2)(A) and the court agreed. *Id.* at 617. Unlike the case before the court, *McKnew* did not address a scenario in which equivalent amounts of money were allegedly used in the required manner.

In sum, Plaintiff has not shown by a preponderance of evidence that Poulos, Inc. made a false representation or used loan proceeds in an unauthorized manner. Nor has Plaintiff provided any other compelling reasons to believe that Defendant intended to defraud Plaintiff. Therefore, this Court finds that Plaintiff is not entitled to summary judgment.

B. *Under the LIB tracing method, Defendant is entitled to summary judgment except with respect to $26,000*

To prevail at the summary judgment stage, Defendant must demonstrate that, after drawing all reasonable inferences in favor of Plaintiff, the undisputed facts make it impossible for Plaintiff to prove (by a preponderance of evidence) one or more elements of Plaintiff's § 523(a)(2)(A) action. *See Liberty Lobby*, 477 U.S. at 248-49.

The choice of tracing method affects the amount on which Defendant is entitled to summary judgment.[9]  Under LIFO, Defendant would likely be entitled to a summary judgment finding all $149,000 dischargeable.  That is, nothing in the record suggests that the first $220,000 out of the RB account after the LOC proceeds were deposited on March 15, 2018 was not spent on business operations.  *See* Dkt. No. 62; Dkt. No. 68, Exhibit 6A; Dkt. No. 74.  As explained below, however, under LIB Defendant is entitled to summary judgment on all but the $26,000 transfers, because $26,000 is the amount in Defendant's personal account that may be traceable (using LIB) to loan proceeds.

To select a "fair and equitable" tracing method by which to evaluate Defendant's cross-motion for summary judgment, the court must weigh the principle of construing nondischargeability provisions in favor of honest debtors against the need to draw all reasonable inferences in the nonmovant's favor.  *Lantz*, 451 B.R. at 847-48.  *See also Bullock*, 569 U.S. at 275-76; *Miller*, 310 B.R. at 299; *Liberty Lobby*, 477 U.S. at 248-49.  *Mississippi Valley* tips this particular balance for Plaintiff.  *See Mississippi Valley*, 745 F.3d at 308 ("When tracing funds in a commingled account, the lowest-intermediate-balance rule determines the extent of the claimant's interest in the account.").  Though the Seventh Circuit was adjudging the legitimacy of a constructive trust in a preference action under 11 U.S.C. § 547, its reason for adopting LIB in *Mississippi Valley* is also the reason Illinois law uses LIB to trace a secured creditor's interest in the identifiable proceeds of a sale of collateral.  *Id*.  Namely, whenever the law requires a creditor to identify which of its debtor's many expenditures were made using the funds upon which that creditor has a claim, the most that can be said with certainty is this: If the debtor expends more

---

[9] The FIFO and pro rata tracing methods are not considered here.  They are not computationally tractable given the information in the record, while LIFO and LIB are, so FIFO and pro rata are therefore not "best suited to achieve a fair and equitable result on the facts before [the court]." *Lantz*, 451 B.R. at 847-48 (quoting *United States v. Henshaw*, 388 F.3d 738, 741 (10th Cir.2004)).

money than it has received or earned from all sources other than the creditor, some of that expenditure *must* have been made using the creditor's funds.  LIB simply:

> provides a presumption that proceeds remain in the [debtor's] account as long as the account balance is equal to or greater than the amount of the proceeds deposited. The proceeds are 'identified' by presuming that they remain in the account even if other funds are paid out of the account.

*C. O. Funk & Sons, Inc. v. Sullivan Equip., Inc.*, 89 Ill. 2d 27, 31 (1982).  LIFO is a different presumption that plainly does not afford even this vague certainty; it is perfectly possible that the first funds to leave an account after proceeds are deposited are *not* those proceeds.  Consequently, LIB is the tracing method that is more fair and equitable to, and allows all reasonable inferences to be drawn in favor of, Plaintiff (who is the nonmovant with respect to Defendant's cross-motion for summary judgment).

Of the $170,000 transfers, the RB account statements indicate that (i) $120,000 of it was withdrawn from the RB account on days when the account balance exceeded $220,000 by more than the amount of the withdrawal in question, and (ii) $50,000 of it was withdrawn on days when the account balance was (or may have been[10]) less than $220,000.  Under LIB, the court presumes that the $120,000 was not loan proceeds and thus was not governed by the Covenant.  Therefore, with respect to $120,000, Plaintiff cannot demonstrate that Poulos, Inc. made a false representation, so it is appropriate to grant summary judgment in favor of Defendant.

By the same token, the court also relies on LIB to presume that the $50,000 transfers were (or may have been) loan proceeds governed by the Covenant.  After all, if it had not been for the final $220,000 draw on the LOC, the checks effectuating the $50,000 transfers likely would have

---

[10] This caveat is necessary because one of the four checks (check number 120351) effectuating the $50,000 transfers does not actually appear in the RB account statements, though both parties agree that it exists.  *See supra*, note 6.  This uncertainty does not affect the court's reasoning, however, because if the balance may have been less than $220,000, then Plaintiff may be able to prove that check number 120351 did transfer loan proceeds, which is sufficient to place in genuine dispute a fact material enough to preclude summary judgment for Defendant with respect to the $10,000 transferred by check number 120351.

bounced.  Of those $50,000, $26,000 could have ended up in Defendant's personal account, which may or may not have constituted a violation of the Covenant.  In short, the undisputed facts do not preclude Plaintiff from proving that Poulos, Inc. falsely represented that it would use those $26,000 for its business operations.  Therefore, it is inappropriate to grant summary judgment to Defendant with respect to $26,000.  Finally, the record suggests that the remaining $24,000—which is deemed to include $3,000 of the $149,000 in question—was both subject to and used in compliance with the Covenant.

## CONCLUSION

Plaintiff's motion for summary judgment is DENIED.  Defendant's cross-motion for summary judgment is GRANTED solely with respect to $123,000 and DENIED with respect to $26,000.

Dated: February 16, 2022

_____
Honorable Deborah L. Thorne
United States Bankruptcy Judge